UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DARLENE S. CHUMLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:04-cv-1614-DFH-WTL |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Darlene Chumley seeks judicial review of a final decision by the Commissioner of Social Security denying her application for disability insurance benefits. Administrative Law Judge ("ALJ") Stephen Davis determined that Ms. Chumley was not disabled under the Social Security Act because her severe impairments did not meet or medically equal any impairment listed in Subpart P, Appendix 1 of the regulations, and because she retained the residual functional capacity to perform her past relevant work.[1] Ms. Chumley contends that the ALJ erred in (1) failing to consider the effect of her mental impairments, both alone and in combination with her physical impairments; and (2) failing to obtain an additional psychological examination. As explained below, the ALJ adequately

---

[1] ALJ Davis replaced ALJ Charles Ardery after Ms. Chumley's hearing. The case was reassigned to ALJ Davis because of ALJ Ardery's illness.

considered Ms. Chumley's mental impairments and was not required to obtain the additional exam. The ALJ's decision is supported by substantial evidence and is affirmed.

*Background*

Darlene Chumley was 57 years old on the alleged disability onset date of September 27, 2000, and was 60 years old when the ALJ denied her application for Social Security benefits in July 2003. She completed high school and has past work experience as an assembler and a cashier. R. 512. Ms. Chumley's main problem was chronic fatigue. R. 488-89.

Ms. Chumley has a history of fatigue and weakness dating back to 1997. On September 8, 1997, she was seen at the Bloomington Hospital with complaints of dizziness, weakness, and loss of strength in her extremities. R. 302.

Ms. Chumley has filed two applications for disability insurance benefits. She first applied for disability benefits on October 14, 1998. On March 9, 1999, Robyn Goshorn, M.D., diagnosed idiopathic chronic fatigue on referral from the Disability Determination Bureau as part of Ms. Chumley's 1998 application for benefits. R. 154-57.

On March 30, 1999, Ms. Chumley underwent a psychological evaluation by Dr. Fink, Ph.D., as part of her 1998 application. Dr. Fink concluded: "The claimant is found to be alert, oriented, cognitively intact, with a memory profile that is well within normal limits. The difficulties experienced in energy levels, fatigue, etc., could be attributable to a number of sources. My impression is that the claimant is somewhat depressed." R. 178.

On April 7, 1999, Mark Goren, M.D., diagnosed chronic fatigue syndrome on referral from the Disability Determination Bureau as part of Ms. Chumley's 1998 application for disability benefits. R. 182-85.

On April 9, 1999, Dr. Unversaw, Ph.D., a state agency psychologist, reviewed her records and opined that Ms. Chumley did not have a severe psychological impairment. R. 187. On August 31, 1999, Dr. Kladder, Ph.D., reviewed her records and concurred with Dr. Unversaw's opinion. *Id.*

Ms. Chumley's 1998 application was ultimately denied by ALJ Sarah Miller in a hearing decision dated September 26, 2000. R. 44-49. Ms. Chumley did not request review by the Appeals Council for the September 26th decision.

On December 14, 2000, Ms. Chumley requested an appointment with Dr. Wilkey, M.D., because of feelings of depression. R. 373. She had been taking Zoloft for depression for three years before her appointment with Dr. Wilkey, but

had stopped taking it several months before seeing Dr. Wilkey because it was effective and she was feeling better. *Id.* By the time of the appointment, feelings of depression had returned. She reported thoughts of suicide but had no definite plan. *Id.* Dr. Wilkey diagnosed a history of major depressive disorder and chronic fatigue syndrome. He assigned a GAF of 75.[2] R. 377. He prescribed that she resume taking Zoloft because it had been effective in the past. *Id.*

On December 9, 2000, Ms. Chumley visited Dr. Nickerson, D.O., because she wanted a primary care physician "so that she can have acute issues taken care of quickly." R. 382. Ms. Chumley reported that she had a problem with chronic fatigue, that she had been taking Zoloft, and that her problem was not with depression but was more physical. R. 382.

Ms. Chumley submitted her second application for disability benefits on January 8, 2001. She returned to Dr. Nickerson on January 9, 2001, to "follow up on depression." R. 383. Ms. Chumley reported that "since getting back on the Zoloft, she has returned to herself, is able to 'enjoy life.'" *Id.* Dr. Nickerson suggested the possibility of psychological counseling but Ms. Chumley declined. Dr. Nickerson reported that her depression/anxiety was "[c]ontrolled at this time on Zoloft 100mg daily." *Id.*

---

[2]GAF is an acronym for Global Assessment Functioning. It is a mental health rating that estimates a person's psychological, social, and occupational capacities. American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000). A GAF of 75 indicates "no more than slight impairment in social, occupational, or school functioning." *Id.* at 34.

On February 14, 2001, Ms. Chumley returned to Dr. Nickerson. He again reported that her depression/anxiety was stable on the Zoloft and that she still did not want psychological counseling. R. 384.

On June 30, 2001, Ms. Chumley underwent a mental status exam by Dr. Karkut, a clinical psychologist, on referral from the state agency. R. 402-06. Ms. Chumley stated that she did not think of herself as depressed. She reported that she was tired all the time but that Zoloft helped her energy level. R. 404. She reported that when her medicine ran out for three weeks she had suicidal thoughts but that the episode was brief. Ms. Chumley reported that she could do daily activities such as cooking, laundry, sweeping, and driving, but that these activities tired her and required that she rest frequently. R. 405. She reported that she used to read a lot but had trouble concentrating. *Id.*

Dr. Karkut noted that Ms. Chumley's most prominent symptoms were sleep disturbance, poor concentration and fatigue. *Id.* He concluded:

> Although her medical records indicate "depression/anxiety", she reported no collection of features that would suggest the presence of anxiety disorder. . . . I have assigned a diagnosis of Mood Disorder Due to Chronic Fatigue Syndrome, with Depressive Features because of the close connection between her fatigue, sleep disturbance, concentration problems, and the onset of her chronic fatigue. Although symptoms such as sleep disturbance and fatigue do not necessarily stem from depression, the fact that suicidal ideation has been present leads me to conclude that this is indeed a mood disorder and not merely aspects of a physical condition alone (i.e. Chronic Fatigue Syndrome).

> Although the word "anxiety" is mentioned in her records, she does not appear to have anxiety disorder. Also, she does not meet criteria of any personality disorder[.]"

R. 405-06. Dr. Karkut assigned Ms. Chumley a GAF of 50, indicating serious symptoms or serious impairment in social, occupational, or school functioning.

On July 21, 2001, Wael Harb, M.D., performed a consultative evaluation of Ms. Chumley and diagnosed chronic fatigue syndrome. R. 407-08. On August 21, 2001, Dr. Shipley, Ph.D., a state agency psychologist, reviewed the medical evidence and concluded that Ms. Chumley did not have a severe mental impairment. R. 418. He opined that she had a mood disorder related to her physical symptoms. R. 421. Evaluating the "B Criteria" under Listing 12.04 (Affective Disorders), he rated as "mild" the degree of limitation in the areas of daily activities, social functioning, and maintenance of concentration, persistence or pace. He found no episodes of decompensation. R. 428. Another state agency psychologist (whose name is indecipherable) reviewed the record and concurred in Dr. Shipley's report as written. R. 418.

Ms. Chumley's January 8, 2001, application for disability benefits was denied initially and on reconsideration. Ms. Chumley filed a timely request for a hearing before an ALJ. She appeared and testified at a hearing held on March 26, 2003, before ALJ Charles Ardery.

Dr. Giesel, M.D., testified as a medical expert at Ms. Chumley's administrative hearing. She testified that Ms. Chumley's chronic fatigue syndrome did not meet or equal an impairment in the Listings. She opined that Ms. Chumley could sit for one hour at a time and for seven hours in an eight-hour workday. She could stand or walk for twenty minutes at a time and for one hour in an eight-hour workday. She could lift and carry five pounds frequently and ten pounds occasionally. R. 507-08.

Dr. Thomas, Ph.D., also testified as a medical expert at Ms. Chumley's administrative hearing. Dr. Thomas opined, after reviewing the files and listening to the hearing testimony, that "it looks like we might need another evaluation from a psychological point of view." R. 509. He specifically noted Dr. Karkut's opinion as suggesting to him "that there might be a somatoform" disorder. R. 510.

Gail Ditmore testified as a vocational expert at Ms. Chumley's administrative hearing. Given the residual functional capacity as stated by Dr. Giesel, Ditmore opined that Ms. Chumley could perform her past work as an assembler. R. 512. The hearing concluded with ALJ Ardery noting the possibility of obtaining the additional psychological test.

ALJ Davis replaced ALJ Ardery after the hearing. ALJ Davis found no good cause to reopen the September 26, 2000, disability decision. He found that the relevant period for adjudication of the new claim began on September 27, 2000.

R. 23. ALJ Davis admitted new evidence of degenerative disc disease not presented at the hearing. ALJ Davis issued a decision on July 22, 2003, finding Ms. Chumley not disabled. The Appeals Council denied review on August 25, 2004. The ALJ's decision is treated as the final decision of the Commissioner. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

*The Statutory Framework for Determining Disability*

To be eligible for the disability insurance benefits she seeks, Ms. Chumley must establish that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d). Ms. Chumley could establish disability only if her impairments were of such severity that she was unable to perform not only the work she had previously done, but also any other kind of substantial work existing in the national economy. 20 C.F.R. § 404.1520(f) and (g).

This eligibility standard is stringent. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). The Act provides important assistance for some of the most disadvantaged members of American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful

impairments – are available as disability benefits, it must be clear that a claimant has an impairment severe enough to prevent her from performing virtually any kind of work. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability. See 20 C.F.R. § 404.1520(a)(4). The steps are as follows:

(1) Is the claimant engaged in substantial gainful activity? If so, she is not disabled.

(2) If not, does the claimant have a severe impairment or combination of impairments? If not, she is not disabled.

(3) If so, does the impairment meet or equal an impairment listed in the regulations? If so, the claimant is disabled.

(4) If not, can the claimant do her past relevant work? If so, she is not disabled.

(5) If not, can the claimant perform other work in the national economy given her residual functional capacity, age, education, and experience? If not, she is disabled.

When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

At step one, the ALJ found that Ms. Chumley had not engaged in substantial gainful activity since September 27, 2000. At step two, the ALJ found

that Ms. Chumley had severe impairments of chronic fatigue syndrome, degenerative disc disease, and obesity. The ALJ found that her psychological impairment was not severe under the regulations. At step three, the ALJ found that Ms. Chumley's impairments did not meet or equal any of the listed impairments in Subpart P, Appendix 1 of the regulations. At step four, the ALJ found that Ms. Chumley was able to perform her past relevant work as an assembler. Accordingly, the ALJ found her not disabled under the Act without reaching step five. R. 27.

*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888

(7th Cir. 2001). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). To affirm the ALJ's ruling, the court also must be convinced "that the ALJ considered the important evidence, [and] that the reasons he provided 'build an accurate and logical bridge between the evidence and the result.'" *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999), quoting *Sarchet v. Chater*, 78 F.3d at 307.

*Discussion*

Ms. Chumley advances two arguments for remand: (1) the ALJ failed to consider the effect of her psychological impairments, both alone and in combination with her physical impairments; and (2) the ALJ erred in failing to obtain a further psychological evaluation.[3]

---

[3]Ms. Chumley also argues that the ALJ erred in failing to find her mental impairment "severe" at step two. Her challenge to the ALJ's evaluation of the severity of her mental impairment is not properly a step-two challenge. Step two of the five-step evaluation sequence is merely a threshold step to determine whether the claim proceeds to step three. See *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n.2 (7th Cir. 1984) ("Inclusion of this step in the sequential analysis was designed to improve program efficiency by 'limiting the number of cases in which it would be necessary to follow the vocational evaluation sequence'"); *Johnson v. Heckler*, 776 F.2d 166, 169 (7th Cir. 1985) (Easterbrook, J., dissenting) (describing step two as "a useful screen to focus attention on a threshold

I.    *Psychological Impairments*

Ms. Chumley asserts that the ALJ "has not considered the effects of the claimant's psychological impairments, much less the combined effect of the physical and psychological." Pl. Br. at 3. This is incorrect.

The ALJ found that Ms. Chumley suffered from no severe psychological impairment. R. 23. However, he noted that medical evidence in the record showed that "she does have a mood disorder due to chronic fatigue syndrome with depressive features . . . and has a history of major depressive disorder." *Id.* The ALJ described her history with Zoloft and cited several references to that history in the record. *Id.* He recounted her subjective assessments of her depression. *Id.* He noted that "in evaluating her psychological impairments, I have utilized the technique set forth at 20 CFR 404.920a." *Id.* (The ALJ clearly meant to cite 20 C.F.R. § 416.920a, which sets forth the required technique for evaluation of mental impairments.) The ALJ then proceeded to recount the findings of the state agency psychologists made pursuant to section 416.920a. R. 23-24. The record shows that the ALJ considered the effects of Ms. Chumley's psychological impairments.

---

requirement to filter out people without a hope of getting benefits, and to direct the attention of the ALJs to those with serious cases"). The ALJ found Ms. Chumley to have severe impairments at step two, and he proceeded to step three. The ALJ addressed her mental impairments at later stages of the evaluation sequence as raised in her other arguments discussed in this entry.

The record also shows that the ALJ considered the combined effects of Ms. Chumley's impairments. Dr. Karkut's assessment of Ms. Chumley is clearly based on combined physical and psychological impairments:

> I have assigned a diagnosis of Mood Disorder Due to Chronic Fatigue Syndrome, with Depressive Features because of the close connection between her fatigue, sleep disturbance, concentration problems, and the onset of her chronic fatigue. Although symptoms such as sleep disturbance and fatigue do not necessarily stem from depression, the fact that suicidal ideation has been present leads me to conclude that this is indeed a mood disorder and not merely aspects of a physical condition alone (i.e. Chronic Fatigue Syndrome).

R. 406. The ALJ expressly gave significant weight to this portion of Dr. Karkut's assessment of Ms. Chumley. R. 24.

Additionally, the ALJ stated: "Whether considered individually *or in combination*, the claimant's 'severe' and non-severe impairments do not meet or equal a listing." R. 24 (emphasis added). He also stated: "Considering all of the impairments of record *in combination*, the residual functional capacity noted by Dr. Giesel is reasonable, if a little generous." R. 26 (emphasis added). Such statements ordinarily suffice to show that an ALJ recognized and carried out his duty to consider a claimant's combined impairments. See *Steward v. Bowen*, 858 F.2d 1295, 1298 (7th Cir. 1988) (finding it "clear from the ALJ's opinion" that he considered claimant's impairments in combination where the ALJ stated that the evidence did not establish "that any of claimant's impairments, *either alone or in combination,* are severe enough to either meet or equal the requirements of any

impairments listed"); see also *Corey v. Barnhart*, 2002 WL 663130 at *4 (S.D. Ind., March 14, 2002) ("Though the use of words such as 'combination of impairments' or 'combined effect of impairments' may not be mandatory, use of these or similar words would clearly reflect that the ALJ considered Corey's impairments in combination."). The record shows that the ALJ considered the combined effects of Ms. Chumley's impairments.

      B.    *Additional Psychological Examination*

Ms. Chumley asserts that the ALJ erroneously failed to obtain a further psychological test that could have confirmed that she suffered from somatoform disorder. As a result of this failure, she argues, the ALJ may have underestimated the severity of her psychological impairments. Pl. Br. 2-3.

Dr. Thomas testified at the hearing that "it looks like we might need another evaluation from a psychological point of view." R. 509. He specifically noted Dr. Karkut's opinion as suggesting to him "that there might be a somatoform." R. 510. "In all probability, my . . . sense is that there, although it's not documented, that you probably have a significant contribution for 12.08, probably a 12.07 disorder. But we, but you could, it could be confirmed through an MMPI [II]." R. 511.[4]

---

[4]Sections 12.07 and 12.08 are Listings in the Social Security regulations. 20 C.F.R. pt. 404, subpt. P. app. 1, pt. A. §§ 12.07, .08. Section 12.07 defines "*Somatoform Disorders*" as: "Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." *Id.* at

Ms. Chumley argues that Dr. Thomas's testimony regarding the possibility of somatoform disorder that could be confirmed by an MMPI-II test established that the record was inadequate to determine whether she was disabled, and that the ALJ was thus obliged to order the MMPI-II test. Pl. Br. at 2. The argument is not persuasive.

An ALJ has a duty "to develop a full and fair record" in a Social Security hearing. *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). However, the Seventh Circuit has commented more than once "on the difficulty of having a 'complete' record as 'one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on.'" *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994), quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-67 (7th Cir. 1993). Courts should therefore respect the Commissioner's "reasoned judgment" regarding how much evidence to gather in a particular case. *Luna*, 22 F.3d at 692. The primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant. 20 C.F.R. § 404.1512(c).

Social Security Administration regulations provide that if the evidence in the record is consistent but there is insufficient evidence from which the

---

§ 12.07. MMPI-II is an acronym for Minnesota Multiphasic Personality Inventory – Revised. The MMPI-II is a standardized personality assessment test consisting of over 500 questions that can test for personality traits or disorders including somatoform disorder.

Commissioner can make a disability determination, the Commissioner should try to obtain additional evidence. 20 C.F.R. § 404.1527(c)(3). The regulations also provide that where any evidence "is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have." *Id.* at (c)(2).

In his written decision, ALJ Davis identified an inconsistency between the opinion of Dr. Thomas ("somatoform disorder") and that of Dr. Karkut ("mood disorder"). The ALJ concluded that the record was adequate to resolve that inconsistency without additional psychological testing. The ALJ stated:

> Dr. Thomas testified that there is evidence of somatoform disorder and that another consultative evaluation with [MMPI-II] is needed. He notes there is a possibility of somatoform disorder due to chronic fatigue and some evidence in the record of depression, although the claimant testified she does not feel depressed. However, as discussed above, Dr. Karkut notes a mood disorder due to chronic fatigue syndrome with depressive features, and discounts any diagnosis of anxiety. Therefore, there is already an adequate record [of] the claimant's psychological impairments. . . . Further, administration of an MMPI would not answer the question as to the claimant's functional capacity. Therefore, I conclude that no additional psychological evaluation or testing is warranted.

R. 24. The ALJ's choice to forego additional testing based on the adequacy of the existing record was permissible under 20 C.F.R. § 404.1527(c)(2). Because he had identified an inconsistency, he was entitled to weigh the evidence.

The ALJ had before him numerous medical opinions (including treating and examining sources) relevant to the alleged period of disability supporting his conclusion that Ms. Chumley was not disabled. Dr. Wilkey (examining) had assigned Ms. Chumley a GAF of 75, indicating no more than slight impairment in social, occupational, or school functioning. R. 377. He noted her psychological impairments were effectively controlled by Zoloft. *Id.* Dr. Nickerson (treating) also noted that Ms. Chumley's psychological impairments were effectively stabilized by Zoloft. R. 382-84. Dr. Karkut (examining) opined that Ms. Chumley "does not meet criteria of any personality disorder." R. 406. Ms. Chumley reported to Dr. Karkut that Zoloft helped her energy level. R. 404. Dr. Shipley (consultative) concluded that Ms. Chumley did not have a severe mental impairment. He rated as "mild" the degree of limitation caused by her depression in the areas of daily activities, social functioning, and maintenance of concentration, persistence or pace. R. 428. Another state agency psychologist reviewed the record and concurred in Dr. Shipley's report as written. R. 418. Dr. Giesel opined that Ms. Chumley's chronic fatigue syndrome did not meet or equal any listed impairment. R. 507.

By contrast, Dr. Thomas's opinion was the sole evidence in the record suggesting the possibility of somatoform disorder or indeed of any impairment consistent with a finding of disability. Ms. Chumley argues that when Dr. Thomas "asserts that there is evidence of a somatoform disorder and that an MMPI-II is needed in order to evaluate it, that is an expert opinion, that the ALJ is not

qualified to reject without violating [the Seventh] Circuit's frequent injunctions against 'playing doctor.'" Pl. Br. at 2. The argument is not persuasive. The ALJ was entitled to weigh the existing evidence pursuant to § 404.1527(c)(2), and he was not required to give the opinion of Dr. Thomas controlling weight. The opinions of medical experts are subject to the same evaluation criteria as opinions from other medical sources. 20 C.F.R. § 404.1527(f)(2)(iii). Dr. Thomas was neither Ms. Chumley's treating physician, nor was he even an examining physician. See 20 C.F.R. § 404.1527(d) (generally, more weight is given to treating and examining sources than non-treating and non-examining sources).

Ms. Chumley further argues that "without the MMPI-II, the ALJ does not know whether the claimant has somatoform disorder or not, much less what effect the claimant's resulting experience of physical symptoms (constant extreme fatigue) has on her residual functional capacity." Pl. Br. at 2. Dr. Thomas provided an alternative diagnosis to explain Ms. Chumley's fatigue based on his review of Dr. Karkut's assessment. He was not questioning the symptoms or the resulting functional limitations identified by Dr. Karkut, nor was he questioning those identified by any other medical source in the record. He suggested only an alternative diagnosis. He expressed no opinion as to the severity of her condition or its resulting limitations.

Ms. Chumley has identified no gap in the record regarding the limitations resulting from her fatigue, and it simply does not matter for these purposes

-18-

whether her limitations derived from a mood disorder due to chronic fatigue syndrome or, as Dr. Thomas speculated, somatoform disorder. The ALJ considered substantial evidence of limitations related to her fatigue. R. 25. Dr. Giesel expressly referenced evidence of fatigue as part of the basis for her assessment of Ms. Chumley's residual functional capacity. The ALJ relied on that assessment and credited much of the evidence of Ms. Chumley's fatigue in determining that she retained the functional capacity only for unskilled sedentary work with additional restrictions. *Id.* ("The claimant's testimony of completely debilitating fatigue is not supported by the record, but does justify a restriction to sedentary work.").

Further, Ms. Chumley concedes that, as noted by the ALJ, an MMPI-II would not address the question of her residual functional capacity. However, she states that "Dr. Thomas could presumably be able to provide an evaluation of Ms. Chumley's functional capacity based on the MMPI results and the other evidence, including the other psychological evaluations and the claimant's own testimony." *Id.* at 3. This is pure speculation. Ms. Chumley has not pointed to any specific facts that could have been discovered by the MMPI-II that might have affected her residual functional capacity. Nor has she suggested any facts that could have been discovered by the MMPI-II that might have enabled her to meet her burden of proof under section 12.07. See 20 C.F.R. pt. 404, subpt. P. app. 1, pt. A. § 12.07(A)-(B) (setting forth detailed evidentiary showings necessary to establish somatoform disorder). "Mere conjecture or speculation that additional evidence

might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

*Conclusion*

The ALJ's decision is supported by substantial evidence in the record. Because there was sufficient evidence presented to permit the ALJ to make a reasoned determination regarding the severity of Ms. Chumley's combined mental and physical impairments, the ALJ was not required to request the additional psychological examination. Accordingly, the decision of the Commissioner is affirmed.

So ordered.

Date: September 7, 2005

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

G. Gene Arnholt
arnholt@sbcglobal.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov